# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 202 | **DATE** | 2/18/2003 |
| **CASE TITLE** | Lyons vs. City of Chicago, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants Adams, Blevins, Slechter, and Dorsch's motion for summary judgment on Counts One and Two (R. 103-1) is granted. Defendant Koplitz's motion for summary judgment on Counts Two, Four, and Five (R. 108-1) is granted. Defendants Savage and Walker's motion for summary judgment on Counts Two, Four, and Five (R. 75-1) is granted. Defendant the City of Chicago's motion for summary judgment on Counts Three and Six (R. 99-1) is granted. Defendants Grand Central Corporation, George Carelli, Dorothy Carelli, and Stefanits' motion for summary judgment on Counts Two, Four, and Five (R. 96-1) is granted. This Court will retain jurisdiction over the Plaintiff's remaining state law claims.

(11) ■ For further detail see order attached to the original minute order.

| | No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | **FEB 19 2003** | | 208 |
| ✓ | Docketing to mail notices. | | | date docketed | | |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| | | courtroom deputy's initials | | date mailed notice | | |
| | TH✓ | | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|                                                    |     |              |
|----------------------------------------------------|-----|--------------|
| JEFFREY LYONS,                                     | )   |              |
|                                                    | )   |              |
| Plaintiff,                                         | )   |              |
|                                                    | )   |              |
| v.                                                 | )   | No. 01 C 202 |
|                                                    | )   |              |
| JAMES ADAMS, ANDY BLEVINS,                         | )   |              |
| SCOTT SLECHTER, BRIAN DORSCH,                      | )   |              |
| DONALD KOPLITZ, LISA WALKER,                       | )   |              |
| RAYMOND SAVAGE, the CITY OF                        | )   |              |
| CHICAGO, GRAND CENTRAL                             | )   |              |
| CORPORATION, GEORGE CARELLI,                       | )   |              |
| DOROTHY CARELLI, and ELLEN                         | )   |              |
| STEFANITS,                                         | )   |              |
|                                                    | )   |              |
| Defendants.                                        | )   |              |

DOCKETED

FEB 1 9 2003

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge

Defendants have filed five different motions for summary judgment. James Adams, Andy Blevins, Scott Slechter and Brian Dorsch have moved for summary judgment on Counts One and Two of the Second Amended Complaint. Donald Koplitz has moved for summary judgment on Counts Two, Four and Five. Lisa Walker and Raymond Savage have moved for summary judgment on Counts Two, Four and Five. The City of Chicago has moved for summary judgment on Counts Three and Six. Finally, Grand Central Corporation, George Carelli, Dorothy Carelli, and Ellen Stefanits have moved for summary judgment on Counts Two, Four and Five. For the reasons discussed below, the Court grants each of these motions.

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party that bears the burden of proof on a particular issue, however, may not rest on its pleadings but must affirmatively demonstrate that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. at 2553. A mere scintilla of evidence in support of the non-movant's position is insufficient. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

The Court "considers the evidentiary record in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). The Court accepts the non-moving party's version of any disputed facts but only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## **BACKGROUND**

Shortly after midnight on November 25, 2000, Plaintiff Jeffrey Lyons joined a friend named George Gooch at a bar called Grand Central Station in Chicago, Illinois. (*See* R. 138-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Adams, Blevins, Slechter and Dorsch, ¶ 10.) Lyons and Gooch arrived at Grand Central Station at approximately 1:00-1:30 a.m. and stayed until the bar closed at approximately 4:00 a.m. (*Id.*)

Grand Central Station is owned by the Grand Central Corporation, which is in turn owned by George and Dorothy Carelli. (*See* R. 135-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Grand Central, ¶ 1.) At the time of the incident, Mr. and Mrs. Carelli lived with their daughter in the apartment above Grand Central Station. (*See* R. 134-1, Pl.'s LR 56.1(b)(3)(B) Statement re Grand Central, ¶ 72.) Ellen Stefanits was the bartender working that evening, although Mr. Carelli had visited the bar several times during the course of the evening. (*See* R. 135-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Grand Central, ¶ 13.) Mr. and Mrs. Carelli and Stefanits knew several police officers who were regular customers at Grand Central Station. (*See* R. 134-1, Pl.'s LR 56.1(b)(3)(B) Statement re Grand Central, ¶ 68.)

Grand Central Station is frequented by police officers, and there were several off duty police officers at the bar that night. (*See* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶¶ 1, 7.) Among the police officers at the bar that night were James Adams, Andy Blevins, Scott Slechter and Brian Dorsch. (*See* R. 138-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Adams, Blevins, Slechter and Dorsch, ¶ 6.) Adams, Blevins, Slechter, and Dorsch arrived at Grand Central Station after their shifts ended and they went off duty at approximately 2:00 a.m. (*Id.* ¶¶ 5-6.) There were several other unidentified off duty police

officers at Grand Central Station that night, including some officers who were Hispanic. (*See* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶ 13.)

Around closing time, Lyons and Gooch exited the bar and stood outside talking, near a pickup truck owned by Slechter. (*See* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶ 14.) As they exchanged goodbyes, Lyons and Gooch hugged. (*Id.* ¶ 15.) Slechter happened to exit the bar as Lyons and Gooch hugged. He saw the two hug and told them, "Why don't you take that faggot bullshit away from my truck." (*Id.* 16.) Lyons asked Slechter what the problem was, and Slechter replied, "I'll show you my problem." (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 23.) Slechter then punched him in the face, and the two men started fighting. (*See* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶ 17.)

Other police officers joined the fracas. Dorsch grabbed Lyons and pulled him off Slechter. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 27.) Several officers exited Grand Central Station and started punching and kicking Lyons. (*See* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶ 19.) Gooch tried to intervene to protect Lyons but stopped when other officers lifted their jackets to reveal that they were carrying handguns. (*Id.* ¶ 21.) None of the officers actually unholstered a weapon or pointed it at Lyons or Gooch. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 32-33.)

Lyons' attackers were not wearing police uniforms, (*see* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶ 12); did not identify themselves as police officers, (*see* R. 138-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Adams, Blevins, Slechter and Dorsch, ¶ 12); did not display their badges, (*id.*); did not order Lyons or Gooch up against the wall, (*id.*

¶ 13); and did not inform them they were under arrest. (*Id.*) Nonetheless, Lyons and Gooch were aware that Lyons' attackers were off duty police officers because Lyons and Gooch had seen the officers in the bar before it closed. (*See* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶¶ 7-11.)

The fight ended when Gooch called 911 on his mobile phone, which prompted the officers fighting with Lyons to stop. (*See* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶ 21.) Some of the officers who joined in the fight left but not before Gooch wrote down the license plate numbers of three cars leaving the scene. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 39.) It was later determined that those three license plates were registered to Adams, Blevins, and Dorsch. (*Id.* ¶¶ 77, 79.) In addition, Gooch also wrote down the license plate number for Slechter's pickup truck. (*Id.* ¶ 40.) It is therefore clear that Adams, Blevins, Slechter, and Dorsch all left the scene prior to the arrival of the police.

Sergeant Donald Koplitz arrived on the scene at Grand Central Station at approximately 4:30 a.m. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 42.) Koplitz spoke to Gooch, who explained that several persons who had participated in the attack on Lyons were inside the bar. (*Id.* ¶ 44-45.) Gooch also informed Koplitz that he had written down the licence plate numbers of several cars that had left with persons who participated in the fight. (*Id.* ¶ 45.) Lyons confirmed that some of the persons who had attacked him were inside the bar. (*Id.* ¶¶ 46.)

Koplitz entered the bar where he spoke to several individuals, including three or four individuals who Gooch believed had been involved in the fight. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 47, 51-52.) Koplitz also spoke to Mr. and Mrs. Carelli inside the bar. (*See* R. 134-1, Pl.'s LR 56.1(b)(3)(B) Statement re Grand Central, ¶ 76.) Mr. Carelli

had learned about the fight when his wife had come upstairs to tell him that something was going on outside the bar. (*Id.* ¶ 75.) Mr. Carelli had stuck his head outside the door. (*Id.* ¶¶ 77-78.) Mr. Carelli saw that Lyons was bleeding and that there was blood on the sidewalk and the curb. (*Id.* ¶¶ 77, 80.) After Koplitz exited the bar, Gooch explained that he believed that some of the individuals in the bar had participated in the attack on Lyons. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 57.) In addition, Gooch provided the license plate numbers that he had jotted down prior to the arrival of the investigating officers. (*Id.* ¶ 54.)

After exiting the bar, Koplitz requested a "paper car" -- *i.e.*, a squad car with patrolmen assigned to the beat who could prepare a case report. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 58.) Officers Walker and Savage arrived on the scene at Grand Central Station as Lyons received medical attention from paramedics. (*Id.* ¶ 59.) Walker and Savage were called to the scene merely to assist Koplitz, and Koplitz gave them limited instructions. (*Id.*, ¶ 58; *see also* R. 92-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Walker and Savage, ¶¶ 27, 29.) At the scene, Walker and Savage spoke to Lyons and Gooch and canvassed the immediate area for potential witnesses and suspects. (*See* R. 92-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Walker and Savage, ¶¶ 29, 31-32.) Significantly, Walker and Savage arrived after Koplitz spoke to the individuals inside the bar and no one told Walker and Savage that there were additional potential witnesses and suspects inside the bar. (*Id.* ¶¶ 25, 28, 33.)[1]

---

[1] Lyons disputes the suggestion that Walker and Savage received "limited" instructions, and he contends that Koplitz informed them that he spoke to other witnesses and suspects inside Grand Central Station. Lyons, however, does not provide evidence that supports these assertions. (*See* R. 92-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Walker and Savage, ¶¶ 28-29.) Moreover, Lyons later admits that no one ever informed Walker and Savage that any potential suspects were still inside the bar when they arrived at the scene. (*Id.* ¶ 33.)

At approximately 4:44 a.m., an ambulance left Grand Central Station to take Lyons to the hospital for treatment of his injuries. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 64-65.) Koplitz instructed Walker and Savage to follow Lyons to the hospital and to prepare a written report. (*Id.* ¶ 60.) In addition, Koplitz requested that an evidence technician go to the hospital to take pictures of Lyons' injuries. (*Id.* ¶ 62.)

At approximately 4:55 a.m., Koplitz notified the Chicago Police Department's Office of Professional Standards ("OPS") of the incident, as he was required to do within one hour of receiving a complaint of excessive force involving a police officer. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 66, 68.)[2] Koplitz gave OPS the license plate numbers he had received from Gooch. (*Id.* ¶ 67.)

Koplitz then returned to the 25th District police station to prepare an initiation report. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 73.) While drafting his report, Koplitz received a call from Savage who explained that they were having trouble interviewing Lyons at the hospital. (*Id.* ¶ 74.) Koplitz gave Savage instructions on filling out the case report and directed him to obtain certain information from Lyons and Gooch. (*Id.* ¶ 76.) Koplitz ran the license plate numbers he had received from Gooch and determined that three of the numbers were registered to Adams, Blevins, and Slechter. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 77, 79.) Koplitz included that information with his initiation report. (*Id.* ¶¶ 78, 82.) At first, one license plate number did not show a registered owner, but it was later determined

---

[2] Lyons denies that Koplitz informed OPS of "the incident," suggesting that Koplitz told OPS some sanitized version of what actually happened at Grand Central Station that night. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 66.) Lyons provides no evidence to support this assertion, however.

that the license plate was registered to Dorsch. (*Id.* ¶¶ 80-81.) Koplitz distributed copies of his initiation report to OPS, his commanding officer, the Area 5 Deputy Chief, and the Police Superintendent's Office. (*Id.* ¶ 84.)

Walker and Savage attempted to interview Lyons at the scene and at the hospital but he declined to speak with them. (*See* R. 92-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Walker and Savage, ¶ 31.) Walker and Savage did speak to Gooch both at the scene and at the hospital. (*Id.* ¶ 32.) Gooch described the incident and gave them the license plate numbers that he had recorded. (*Id.*) Walker and Savage prepared a case report and gave Lyons the report number. (*Id.* ¶ 35.) Walker and Savage then returned to the police station because it was the end of their shift. (*Id.* ¶ 36.)

OPS is responsible for investigating allegations of excessive force involving the police. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 85.) Nichelle Fraction, an OPS investigator, arrived at the hospital where Lyons received treatment just before 5:00 a.m. and attempted to interview him. (*Id.* ¶ 69.) Lyons declined to speak to her or anyone else with the police department. (*Id.* ¶ 71.) OPS investigator Elizabeth Carmody conducted an investigation of Lyons' allegations and prepared a report summarizing her findings. (*Id.* 86.)

Lyons filed suit against Adams, Blevins, Slechter, Dorsch, Koplitz, Walker, Savage, the City of Chicago, Grand Central Corporation, Mr. Carelli, Mrs. Carelli, Stefanits, and certain unknown Chicago police officers. Lyons' Second Amended Complaint asserts the following claims: violation of 42 U.S.C. § 1983 (Count One); conspiracy under 42 U.S.C. § 1983 (Count Two); battery (Count Three); state law civil conspiracy (Count Four); state law concert of action (Count Five); indemnification pursuant to 745 ILCS § 10/9-102 (Count Six); and violation of the Illinois Dram Shop Act, 745 ILCS § 5/6-21 (Count Seven).

## ANALYSIS

### I.    COUNT I -- PLAINTIFF'S SECTION 1983 CLAIM

In Count One, Lyons asserts that Adams, Blevins, Slechter and Dorsch deprived him of his Fourth and Fourteenth Amendment rights in violation of Section 1983. In order to prevail on this claim, Lyons must prove: (1) that Adams, Blevins, Slechter and Dorsch deprived him of a right secured by the Constitution and laws of the United States, and (2) that they acted under color of state law when they deprived him of that right. *See Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995); *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). Adams, Blevins, Slechter and Dorsch assert that Lyons' Section 1983 claim fails because he cannot establish that they acted under color of state law.

Traditionally, the courts have held that a defendant acts under the color of state law when he exercises power "'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Thomas v. Pearl*, 998 F.2d 447, 450 (7th Cir. 1993) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043 (1941)). Thus, government employees who act in their official capacity or exercise their responsibilities pursuant to state law act under color of state law. *See Hill v. Barbour*, 787 F. Supp. 146, 149 (N.D. Ill. 1992). Conversely, government employees who act without the cloth of state authority do not subject themselves to liability under Section 1983. *See Hughes*, 880 F.2d at 971.

Although most police officers are state officials for purposes of Section 1983, the mere fact that the defendant is a police officer does not mean that the defendant acted under color of state law. *Gibson v. City of Chicago*, 910 F.2d 1510, 1516 (7th Cir. 1990). Indeed, the Supreme Court has observed that "acts of officers in the ambit of their personal pursuits are plainly

9

excluded." *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040 (1945). On the other hand, "[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." *Id.* at 111, 65 S.Ct. at 1040.[3]

As Judge Conlon has noted, no bright line distinguishes a police officer's personal pursuits from actions taken under color of state law. *Kindred v. Hilt-Dyson*, No. 94 C 4377, 1995 WL 250417, at *3 (N.D. Ill. April 25, 1995) (citing *Pitchell v. Callan*, 13 F.3d 545, 548 (2nd Cir. 1994)). Thus, the question whether a police officer acted under color of state law is not answered by whether the officer was on or off duty at the time. *See, e.g., Klein v. Vanek*, No. 96 C 5834, 1999 WL 966968, at *2 (N.D. Ill. Oct 5, 1999). Further, the accouterments of state authority, such as the police uniform, patrol car, badge or a gun, are not dispositive. *See, e.g., Butler v. Corral*, No. 98 C 802, 1999 WL 1069246, at *3 (N.D. Ill. Nov. 22, 1999).

Instead, the essential inquiry is whether the police officer's actions related in some way to the performance of a police duty. *Gibson*, 910 F.2d at 1517. *See also Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995) ("[T]he specific nature of the acts performed must be considered and their relationship to the officer's performance of his or her official duties."); *Treiber v. Rompala*, No. 01 C 5049, 2002 WL 1467673, at *3, (N.D. Ill. July 9, 2002) ("Even acts committed while a police officer is on duty are not committed under color of state law unless

---

[3] Notably, the Supreme Court has stated that "under color of state law" also means under "pretense" of state law. *See Screws*, 325 U.S. at 111, 65 S.Ct. at 1040. Thus, a police officer who purports to exercise official authority to further private interests is generally considered to be acting under color of state law. *See Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3rd Cir. 1994).

they are in some way related to the performance of police duties.") (citations and quotations omitted).

Judge Coar's recent opinion in *Zienciuk v. City of Chicago*, No. 01 C 3769, 2002 WL 1998309 (N.D. Ill. Aug. 28, 2002), is instructive on the under color of state law issue. In *Zienciuk*, Judge Coar granted summary judgment in favor of two off duty Chicago police officers, holding that they did not act under color state law when they engaged in a bar fight prompted by an alleged derogatory racial remark. 2002 WL 1998309, at *5. Judge Coar noted that "[n]ot only were [the defendants] off-duty, but they were not wearing police uniforms and they did not identify themselves to [the plaintiff] as police officers when they initially approached him." *Id.* Further, neither officer "asserted their police authority over [the plaintiff] by arresting him, and they behaved the same way non-police officers would behave after they got into a brawl." *Id.* at *6. Because the case involved "a bar fight, plain and simple," Judge Coar concluded that the two officers did not act under color of state law. *Id. See also Latuszkin v. City of Chicago*, 250 F.3d 502, 506 (7th Cir. 2001) (upholding dismissal of Section 1983 claims against off duty police officer where the plaintiff failed to allege that the officer "was engaged in any police activity, that he displayed any police power, or that he possessed any indicia of his office").

In this case, Lyons has likewise failed to supply evidence that might support the conclusion that the incident in question involves something more than a simple bar fight. Lyons admits that Adams, Blevins, Slechter, and Dorsch were off duty (*see* R. 138-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Adams, Blevins, Slechter and Dorsch, ¶ 5); did not wear police uniforms (*see* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶ 12);

did not identify themselves as police officers, (*see* R. 138-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Adams, Blevins, Slechter and Dorsch, ¶ 12); did not display their badges, (*id.*); did not order Lyons or Gooch up against the wall, (*id.* ¶ 13); and did not inform them they were under arrest. (*Id.*) In sum, the officers' actions in the fight are indistinguishable from those of private actors that have engaged in a brawl.

Nonetheless, Lyons argues that Adams, Blevins, Slechter and Dorsch acted under color of state law because he knew that they were off duty police officers and because certain other unknown officers revealed to Gooch during the fight that they were carrying handguns. (*See* R. 137-1, Pl.'s Br. in Opp. to Mot. for Summ. J. re Adams, Blevins, Slechter and Dorsch, p.4.) The mere fact that Lyons knew that his attackers were police officers, however, does not mean that those officers acted under color of state law. Indeed, the courts have held that in some circumstances police officers do not act under color of state law even when they are on duty and wearing uniforms, which presumably creates an awareness of their status as police officers on the part of reasonable observers. *See, e.g., Briscoe v. LaHue*, 663 F.2d 713, 721 n.4 (7th Cir. 1981) ("[A]cts committed by a police officer *even while on duty and in uniform* are not under color of state law unless they are in some way 'related to the performance of police duties.'") (emphasis added). *See also Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir. 1976) ("[T]he mere assertion that one is a state officer does not necessarily mean that one is acting under color of state law.").

Moreover, the fact that certain other unknown officers displayed handguns during the fight does not support Lyons' claim that Adams, Blevins, Slechter and Dorsch acted under color of state law. Lyons has presented no evidence that Adams, Blevins, Slechter and Dorsch themselves displayed handguns or were in fact even carrying them at the time. But even if Lyons

had supplied such evidence, the mere use of a service issue weapon does mean that a police officer acts under color of state law. *See Kindred*, 1995 WL 250417, at *4 ("Only the circumstances surrounding the use of the service weapon, not the mere fact of its use, have constitutional relevance."); *see also Pitchell*, 13 F.3d at 548 (off duty police officer who used service issue bullets to shoot a houseguest did not act under color of state law); *Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3rd Cir. 1994) (off duty police officer who used a service issue nightstick in an alleged assault did not act under color of state law).

Lyons also argues that Adams, Blevins, Sclechter and Dorsch acted under color of state law because various rules and regulations that apply to Chicago police officers meant that the officers were effectively on duty at the time of the fight and were therefore required to take "some form of police action." (R. 137-1, Pl.'s Br. in Opp. to Mot. for Summ. J. re Adams, Blevins, Slechter and Dorsch, p.4.) Lyons argument, however, proves too much. As the Defendants point out, *all* off duty misconduct by a Chicago police officer violates the Chicago Police Department's rules and regulations in some way. (*See* R. 156-1, Defs. Adams, Blevins, Slechter and Dorsch's Reply in Support of Summ. J., pp. 4-5.) It does not follow that merely because off duty misconduct violates certain of the Department's rules or regulations, that misconduct must therefore have been committed under color of state law. To hold otherwise would transform every instance of alleged misconduct by an off duty Chicago police officer into an action under Section 1983.

## II.     COUNT TWO -- PLAINTIFF'S SECTION 1983 CONSPIRACY CLAIM

In Count Two, Lyons asserts a Section 1983 conspiracy claim against Adams, Blevins, Slechter, Dorsch, Koplitz, Walker, Savage, Grand Central Corporation, Mr. Carelli, Mrs. Carelli, Stefanits, and certain unknown members of the Chicago Police Department. In essence, Lyons contends that these Defendants conspired to beat up Lyons, to cover up the involvement of some of the officers who attacked him, to avoid a complete investigation of the incident, and to deny him access to the courts.

In order to prevail on his Section 1983 conspiracy claim, Lyons must prove: (1) an express or implied agreement among defendants to deprive him of his constitutional rights, and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement. *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988); *see also Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998). Although a conspiracy may be demonstrated by circumstantial evidence, "mere conjecture" of a conspiracy is not sufficient to avoid summary judgment. *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) ("bald assertions without any evidentiary support" failed to demonstrate a conspiracy); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) (assertions based on mere speculation or conjecture do not withstand summary judgment).

Lyons' Section 1983 conspiracy claim fails for several reasons. *First*, to the extent the Section 1983 conspiracy claim is based on the beating itself, Lyons' claim fails because he has not presented any evidence that the beating was the product of any sort of agreement by Adams, Blevins, Slechter, and Dorsch. To the contrary, the undisputed evidence reveals that the beating was essentially a spontaneous event that lasted just a few minutes.

Moreover, Lyons has not pointed to any evidence connecting Koplitz, Walker, Savage, Grand Central Corporation, Mr. Carelli, Mrs. Carelli and Stefanits to a conspiracy relating to the beating itself. Indeed, Koplitz, Walker, and Savage did not arrive at Grand Central station until after the fight ended and after Adams, Blevins, Slechter, and Dorsch had already left the scene. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 39-40, 42, 58-59.) Further, although Lyons suggests that Mr. and Mrs. Carelli and Stefanits were aware of the fight as it happened, he does not provide any evidence that actually supports that claim.

*Second*, to the extent the Section 1983 conspiracy claim is based on the assertion that the Defendants conspired to cover up his beating, Lyons' claim fails because the beating itself does not give rise to a constitutional violation. As discussed above, Lyons cannot assert a constitutional claim for the beating itself because Adams, Blevins, Slechter, and Dorsch did not act under color of state law. (*See* Section I, *infra*). Because the underlying act does not itself violate the constitution, there can be no constitutional violation for any attempt to cover up the act. *See Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) ("The jury's conclusion that the Cefalus suffered no constitutional injury thus forecloses relief on the conspiracy claim."); *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996) ("[T]here is no constitutional violation in conspiring to cover-up an action which itself does not violate the Constitution."); *Hostrop v. Board of Jr. College Dist. No. 515*, 523 F.2d 569, 576 (7th Cir. 1975) ("[W]e note that a conspiracy allegation does not dispense with the need to identify a right that was violated. Section 1983 authorizes recovery for conspiracy to violate a clearly established right, not for the conspiracy itself.").

***Third***, to the extent that his Section 1983 conspiracy claim is premised on the contention that the Defendants failed to fully investigate the incident, Lyons' claim fails because the Seventh Circuit does not recognize a claim for "inadequate police investigatory work" in the absence of some other recognized constitutional violation. *See Jacobson v. National R.R. Passenger Corp.*, No. 97 C 6012, 1999 WL 1101299, at *10 (N.D. Ill. Nov. 29, 1999) (failure to fully investigate alleged misconduct "does not fall within the protection of the right to judicial access.") (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984)); *Washington v. Godinez*, No. 95 C 7612, 1996 WL 599055, at *3 (N.D. Ill. Oct. 17, 1996) ("[T]here is no constitutional right to an investigation by a police officer unless another recognized constitutional right is involved.").

***Fourth***, to the extent that his Section 1983 conspiracy claim is premised on the claim that the Defendants conspired to deny him access to the courts, Lyons' claim fails because he has not demonstrated that he was denied "adequate, effective, and meaningful" access. *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995) (affirming summary judgment on the plaintiffs' denial of access claim under Section 1983 where cover up by police did not prevent the plaintiff from filing suit). *See also Thompson v. Boggs* 33 F.3d 847, 852 (7th Cir. 1994) (affirming dismissal of denial of access claim under Section 1983 because the plaintiff "was not prohibited from seeking effective and meaningful redress in court"); *Love v. Bolinger*, 927 F.Supp. 1131, 1139 (S.D. Ind. 1996) (granting summary judgment on plaintiffs' denial of access claims based on an alleged police cover up: "The very fact that allegations of the murder and of the cover-up

appear together in a single complaint, filed within five months after Joseph Love's death, leaves no doubt that plaintiffs were not hindered in bringing a lawsuit to vindicate their rights.").

In *Thompson*, for example, the Seventh Circuit affirmed dismissal of the plaintiff's Section 1983 claims against police officers who allegedly denied him access to the court by omitting from their reports the fact that one of the officers had used excessive force in arresting the plaintiff. *Id.* 33 F.3d at 852. The Seventh Circuit emphasized that the plaintiff was not deprived of meaningful access to the courts because "he was personally involved in the incident and had firsthand knowledge of all the facts and circumstances" and "the facts known to [the plaintiff] were sufficient to enable him to promptly file the instant lawsuit." *Id.* Likewise, in this case, notwithstanding his denial of access claim, Lyons, who was a first hand witness to the attack, has not been not prevented from seeking effective and meaningful legal redress.

Moreover, Lyons has not shown that he has been injured by a denial of access as a result of any conspiracy. Because he can recover the full compensatory damages for his injuries from the Defendants currently named in the lawsuit, he cannot show that he has suffered any injury over and above the injuries he suffered as a result of the underlying battery. Absent any injury from the denial of access to the courts itself, Lyons' Section 1983 claim based on the denial of access fails. *See Johnson v. Chicago Police Officer*, No. 99 C 7396, 2000 WL 310320, at *2 (N.D. Ill. Mar. 24, 2000) ("[W]here there are no allegations indicating that defendants' cover-up prevented plaintiff from pursuing a tort action or that the value of such an action was reduced by

the cover-up, a § 1983 action cannot lie as there has been no injury over and above the underlying torts.").[4]

*Finally*, Lyons' Section 1983 conspiracy claim fails because, as discussed in Section III, *supra*, he has failed to provide evidence that any of the Defendants conspired to beat up Lyons or to cover up the involvement of some of the officers who attacked him.[5]

## III.    COUNTS FOUR AND FIVE -- PLAINTIFF'S STATE LAW CONSPIRACY AND STATE LAW CONCERT OF ACTION CLAIMS

In Counts Four and Five, Lyons asserts state law conspiracy concert of action claims against Adams, Blevins, Slechter, Dorsch, Koplitz, Walker, Savage, Grand Central Corporation, Mr. Carelli, Mrs. Carelli, Stefanits, and certain unknown members of the Chicago Police Department. With these claims, Lyons essentially contends that these Defendants conspired to beat up Lyons and then cover up the involvement of some of the officers who attacked him.

---

[4] Koplitz suggests that Lyons' complaint fails to give notice of any denial of access claim under Section 1983, and he suggests that Lyons' purported denial of access claim is improper because it is both forward- and backward-looking. *See, e.g., Christopher v. Harbury*, 536 U.S. 403, __, 122 S.Ct. 2179, 2187 (2002) ("[B]ecause these backward-looking cases are brought to get relief unobtainable in other suits, the remedy sought must itself be identified to hedge against the risk that an access claim be tried all the way through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim."). This Court need not address those arguments, however, because the Court concludes that, properly pled or not, Lyons cannot bring a denial of access case here -- whether forward- or backward-looking.

[5] Defendants suggest that if this Court grants summary judgment on Counts One and Two, which are Lyons' only federal law claims, the Court should decline to exercise jurisdiction over any surviving state law claims. Under 28 U.S.C. § 1367(c)(3), a district court may retain jurisdiction after dismissing all federal law claims when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347-48 (7th Cir.1986). Lyons initiated this lawsuit more than two years ago, the parties engaged in substantial discovery, and the case is now on the very eve of trial. Accordingly, this Court will retain jurisdiction over Lyons' remaining state law claims.

In order to prevail on his state law conspiracy claim, Lyons must demonstrate "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *See Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill.2d 12, 23, 694 N.E.2d 565, 571 (Ill. 1998). Similarly, in order to prevail on his state law concert of action claim, Lyons must establish that the Defendants committed a tortious act in concert or pursuant to a common design. *See Woods v. Cole*, 181 Ill.2d 512, 519, 693 N.E.2d 333, 337 (Ill. 1998). Lyons' state law conspiracy and concert of action claims fail because he has not pointed to any evidence -- as opposed to mere speculation and conjecture -- showing that any of the Defendants acted in concert or pursuant to a common design.

### A.    Adams, Blevins, Slechter and Dorsch

Lyons has supplied no evidence that his beating was the product of any sort of agreement by Adams, Blevins, Slechter, and Dorsch. To the contrary, as discussed above, the evidence confirms that the beating was essentially a spontaneous event. Moreover, the evidence shows that Adams, Blevins, Slechter, and Dorsch were not party to any conspiracy to cover up the involvement of other officers because there is no evidence that those officers played any role in the investigation into the fight other than as potential witnesses and suspects. Indeed, it is clear that Adams, Blevins, Slechter, and Dorsch all left the scene that night before the police ever arrived. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 39-40, 42, 58-59.)

### B.    Koplitz

Further, Lyons has not supplied evidence that would permit a reasonable jury to find that Koplitz joined any conspiracy to cover up the involvement of other officers into Lyons' beating.

19

Lyons' entire case for conspiracy rests against Koplitz on the fact that Koplitz spoke to three or four individuals inside Grand Central Station who participated in the attack but that Koplitz failed to include those names in his report or provide those names to other investigators. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 47, 51-52.) Lyons argues that because Koplitz spoke to these officers, it is reasonable to infer that Koplitz plotted with them to conceal their involvement in the attack. Lyons provides no evidence of such plotting, however, and his assertion that Koplitz conspired to conceal the identity of these other officers represents pure speculation and conjecture.

## C.     Walker and Savage

The evidence that Walker and Savage participated in any alleged conspiracy against Lyons is weaker still. Lyons admits that by the time Walker and Savage arrived on the scene, the only people still outside Grand Central Station were Lyons, Gooch, Koplitz, and the paramedics. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶¶ 42, 45, 54.) Walker and Savage spoke to both Lyons and Gooch, and the officers canvassed the area around Grand Central Station for any other potential witnesses or suspects. As far as they knew at the time, Walker and Savage spoke to all the available witnesses on the scene. Indeed, Lyons does not dispute the testimony by Walker and Savage that no one told them that witnesses and potential suspects were still inside the bar. (*See* R. 92-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Walker and Savage, ¶ 33.) Thus, even assuming that Koplitz knew of and concealed the involvement of other officers, Lyons has pointed to no evidence that Walker and Savage knew of and concealed the involvement of other officers.

Lyons suggests that Walker and Savage passed over potential avenues of investigation, supporting the inference that they conspired to cover up the involvement of other police officers. For example, Lyons emphasizes that Walker and Savage failed to go inside Grand Central Station to interview the people still inside the bar. He also notes that Walker and Savage failed to run the license plate numbers they obtained from Gooch. Lyons' argument, however, ignores the fact that Walker and Savage were called to the scene merely to assist Koplitz and that he gave them limited instructions. (*See* R. 144-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Koplitz, ¶ 58; R. 92-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Walker and Savage, ¶¶ 27, 29.) Moreover, as noted above, it is undisputed that Walker and Savage did not know that there were still potential witnesses and suspects inside the bar when the officers arrived on the scene. (*Id.*, ¶ 33.) Finally, Lyons does not dispute that the report prepared by Walker and Savage included the license plate numbers they obtained from Gooch. (*Id.*, ¶ 32.) Thus, there is no evidentiary support for Lyons' argument that Walker and Savage failed to follow up on potential avenues of investigation.

**D. Grand Central Corporation, Mr. Carelli, Mrs. Carelli, and Stefanits**

Finally, Lyons has not supplied evidence that would permit a reasonable jury to conclude that Grand Central Corporation, Mr. Carelli, Mrs. Carelli or Stefanits participated in any conspiracy to beat Lyons, cover up the involvement of other officers, limit the police investigation, or deny Lyons access to the courts. Lyons argues that Mr. Carelli, Mrs. Carelli or Stefanits were present at Grand Central Station the night of the attack, knew the names of police officers who were at the bar that night, and knew the names of persons who participated in the attack. Lyons argues, therefore, that it can be inferred that they were aware that the beating was taking place and that they knew the identity of the officers who participated in the attack.

Contrary to Lyons' suggestion, however, there is no evidence that Mr. Carelli, Mrs. Carelli or Stefanits knew the identity of other officers involved in the attack. For example, Lyons has pointed to no evidence that Mr. Carelli, Mrs. Carelli or Stefanits actually stepped outside Grand Central Station until after the fight had ended. Indeed, there is no evidence that they were even aware that a fight had taken place until later. At most, the evidence shows that Mr. and Mrs. Carelli were aware that "something" was going on outside the bar. (*See* R. 134-1, Pl.'s LR 56.1(b)(3)(B) Statement re Grand Central, ¶ 75.) Lyons contends that they must have been aware who was involved in the fight because several police officers "came pouring out of the bar and joined the beating." (*See* Pl.'s Br. in Opp. to Mot. for Summ. J. re Grand Central, p.3.) But this ignores the fact that the fight took place as the bar closed, and thus, the fact that officers "pour[ed] out of the bar" offers no reasonable basis to infer that Mr. Carelli, Mrs. Carelli or Stefanits knew the officers were leaving to join a fight.

## IV.    COUNTS THREE AND SIX -- PLAINTIFF'S CLAIMS FOR BATTERY AND INDEMNIFICATION AGAINST THE CITY OF CHICAGO

In Count Three, Lyons asserts a claim for battery against Adams, Blevins, Slechter, Dorsch, and the City of Chicago. Lyons maintains that the City of Chicago is liable for battery under the doctrine of *respondeat superior* because the police officers were acting within the scope of their employment when they allegedly beat him. In Count Six, Lyons asserts that pursuant to Section 10/9-102 the City of Chicago is liable for any judgment entered against Adams, Blevins, Slechter, Dorsch, Koplitz, Walker, and Savage because those officers were acting within the scope of their employment when they allegedly beat him and conspired to cover up the involvement of other officers.

With respect to Koplitz, Walker, and Savage, the City of Chicago admits that those officers acted within the scope of their employment, but it notes that if those officers are not liable then neither is the City. Because this Court grants the motions for summary judgment filed by Koplitz, Walker, and Savage, (*see* Sections II and III, *infra*), judgment is likewise proper for the City of Chicago on Count Six with respect to those officers.

With respect to Adams, Blevins, Slechter, and Dorsch, the City of Chicago asserts that summary judgment is appropriate on Counts Four and Six because Lyons cannot establish that those officers acted within the scope of their employment. The parties agree that Illinois law controls and that the analysis of the scope of employment issue is essentially the same for purposes of liability under the doctrine of *respondeat superior* and indemnification under Section 10/9-102. The parties dispute, however, the definition of the scope of employment under Illinois law and the application of the term to the undisputed facts of this case.

Although "[n]o precise definition has been accorded the term 'scope of employment'" *Sunseri v. Puccia*, 97 Ill.App.3d 488, 493, 422 N.E.2d 925, 930 (1st Dist. 1981), the Illinois courts have applied the following criteria to determine whether an act is within the scope of employment:

> (1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master.
>
> *   *   *
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

23

*Pyne v. Witmer*, 129 Ill.2d 351, 359-60, 543 N.E.2d 1304, 1308 (Ill. 1989). Criminal acts may

fall within the scope of employment, but an employer is not liable for an employee's actions that

"are different from the type of acts he is authorized to perform or were performed purely in his

own interest." *Wright v. City of Danville*, 174 Ill.2d 391, 405, 675 N.E.2d 110, 118 (Ill. 1996).

The burden is on the plaintiff to show the contemporaneous relationship between the tortious act

and the scope of employment. *Pyne*, 129 Ill.2d at 360, 543 N.E.2d at 1308.

The City of Chicago contends that the officers were not acting within the scope of their

employment because they were acting "entirely in pursuit of their own personal goals" and their

actions were not "intended to serve the interests of the City of Chicago." (*See* R. 99-1, City of

Chicago's Mem. of Law in Support of Mot. for Summ. J, p.9.) Lyons downplays the importance

of the officers' subjective intent, citing *Coleman v. Smith*, 814 F.2d 1142, 1149 (7th Cir. 1987).

Further, he disputes the City of Chicago's characterization of the officers' motivations,

suggesting that the beating was not motivated solely by the officers' supposed prejudice against

homosexuals. Finally, Lyons argues that the officers were acting within the scope of their

employment because their actions were "closely connected" to their duties as police officers

under departmental regulations. (*See* R. 141-1, Pl.'s Br. in Opp. to Mot. for Summ. J. re City of

Chicago, pp.5-6.)

Contrary to Lyons' suggestion, *Coleman v. Smith* does not support his effort to minimize

the significance of the officers' subjective intent. In *Coleman*, the plaintiff had sued the Village

of Robbins, the former mayor, and the former chief of police challenging his firing and later false

arrest on charges of impersonating a police officer. 814 F.2d at 1144. Relying on an earlier

Seventh Circuit decision construing a Wisconsin indemnification statute, the Seventh Circuit

24

noted that the scope of employment included "those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objective of the employment." *Coleman*, 814 F.2d at 1149 (quoting *Hibma v. Odegaard*, 769 F.2d 1147, 1152 (7th Cir. 1985). The Seventh Circuit noted that in *Hibma* "subjective intent . . . was not the determining factor in deciding whether their actions were within the scope of their duty." *Coleman*, 814 F.2d at 1149. Applying the reasoning from *Hibma*, the Seventh Circuit held that the former mayor and the former chief of police had acted within the scope of their employment when they disbanded the police department, fired the plaintiff, and falsely arrested him: "The defendants were high level functionaries with wide discretion and power. They were undertaking actions that were a natural part of their employment. Certainly, they were not acting as private individuals." *Id.* at 1150.

The City of Chicago correctly points out, however, that *Coleman* relies on *Hibma* which analyzed Wisconsin law and has since been expressly repudiated by the Wisconsin Supreme Court. *See Olson v. Connerly*, 156 Wis.2d 488, 501 n.13, 457 N.W.2d 479, 488 (Wis. 1990) ("To the extent [*Hibma*] eliminate[s] the employee's intent as a factor, [it is] inconsistent with what we have said here and [is] thus incorrect under Wisconsin law."). Further, Illinois authority issued after *Coleman* confirms the importance of the defendant's subjective intent to the scope of employment issue under Illinois law. *See, e.g., Wright*, 174 Ill.2d at 407-08, 675 N.E.2d at 119 (defendants' actions did not fall within the scope of employment because "the commissioners and corporation counsel stepped aside from their duties as officers of the City of Danville and acted for the sole, unlawful, independent, and personal purpose of promoting their own

25

interests."). *See also Dorsey v. Givens*, 209 F.Supp.2d 850, 853 (N.D. Ill. 2001) ("The approach by the Illinois Supreme Court in *Wright* conflicts with that of the Seventh Circuit in *Coleman* and *Hibma*.").

Thus, contrary to Lyons suggestion, Illinois law holds that where an individual defendant acts solely to promote his or her own personal interests the defendant does not act within the scope of his or her employment. *See Wright*, 174 Ill.2d at 405, 675 N.E.2d at 118 (holding that a defendants' actions "performed purely in his own interest" are not within the scope of his employment); *Wolf v. Liberis*, 153 Ill.App.3d 488, 493, 505 N.E.2d 1202, 1206 (1st Dist. 1987) (off duty police officer who facilitated his fiancé's attempts to leave the scene of an accident and then himself collided with another motorist did not act within the scope of his employment: "His conduct was entirely in pursuit of personal goals and cannot create liability in the city."); *Dzing v. City of Chicago*, 84 Ill.App.3d 704, 707, 406 N.E.2d 121, 122 (1st Dist. 1980) (off duty police officer who broke down the door of a neighbor's apartment and shot the occupant in the mistaken belief that he was entering his own apartment and confronting a burglar did not act within the scope of his employment).

In this case, there is no evidence that Adams, Blevins, Slechter, and Dorsch intended to serve the interests of the City of Chicago. To the contrary, the evidence suggests that the fight was a purely private affair and Adams, Blevins, Slechter, and Dorsch did not intend to carry out any law enforcement function. Lyons admits that the fight started after Slechter made a remark disparaging to homosexuals (*see* R. 140-1, Pl.'s LR 56.1(b)(3)(A) Resp. re City of Chicago, ¶ 16), and Lyons testified that some of his other attackers made similar remarks. (*See* R. 101-1, Appendix of Documents in Support of Mot. for Summ. J. re City of Chicago, Ex. E at p.47

("[E]very single person that was there either kicked me in the face, punched me in the face, called me a faggot, said 'faggot, you'll never win like that, you'll never beat us, faggot . . . ").

Moreover, there is no evidence that Adams, Blevins, Slechter, and Dorsch's actions were in any way connected to their duties as police officers. Lyons admits that the Adams, Blevins, Slechter, and Dorsch were off duty (*see* R. 138-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Adams, Blevins, Slechter and Dorsch, ¶ 5); did not wear police uniforms (*see* R. 136-1, Pl.'s LR 56.1(b)(3)(B) Statement re Adams, Blevins, Slechter and Dorsch, ¶ 12); did not identify themselves as police officers, (*see* R. 138-1, Pl.'s LR 56.1(b)(3)(A) Resp. re Adams, Blevins, Slechter and Dorsch, ¶ 12); did not display their police badges, (*id.*); did not order Lyons or Gooch up against the wall, (*id.* ¶ 13); and did not inform them they were under arrest. (*Id.*)

Nonetheless, Lyons contends that Adams, Blevins, Slechter, and Dorsch acted within the scope of their employment because Chicago police officers are effectively always on duty. Specifically, he suggests that once the fight started the other officers were required to intervene and that by joining the fight Adams, Blevins, and Dorsch effectively took police action. (*See* R. 141-1, Pl.'s Br. in Opp. to Mot. for Summ. J. re City of Chicago, p.6.) The Illinois courts, however, have rejected this argument. *See, e.g., Wolf*, 153 Ill.App.3d at 494, 505 N.E.2d at 1207 ("The rule defining police officers as being 'on-duty' at all times . . . does not support a conclusion that all of the acts of a police officer are therefore within the scope of his employment."); *Banks v. City of Chicago*, 11 Ill.App.3d 543, , 297 N.E.2d 343, (1st Dist. 1973) ("It is true that his being considered 'on duty' at all hours of the day or night does not result in all

27

of his acts being deemed to have been taken in the performance of his duties as a police officer.").[6]

## CONCLUSION

Defendants Adams, Blevins, Slechter, and Dorsch's motion for summary judgment on Counts One and Two (R. 103-1) is granted. Defendant Koplitz's motion for summary judgment on Counts Two, Four, and Five (R. 108-1) is granted. Defendants Savage and Walkers' motion for summary judgment on Counts Two, Four, and Five (R. 75-1) is granted. Defendant the City of Chicago's motion for summary judgment on Counts Three and Six (R. 99-1) is granted. Defendants Grand Central Corporation, George Carelli, Dorothy Carelli, and Stefanits' motion for summary judgment on Counts Two, Four, and Five (R. 96-1) is granted.

DATED: February 18, 2003                    ENTERED

_____
AMY J. ST. EVE
United States District Court Judge

---

[6] Lyons also suggests that, regardless whether the officers acted within the scope of their employment, his claims against the City of Chicago should survive because the City "ratified" the officers' actions. Specifically, Lyons contends that the City of Chicago ratified the officers actions because Koplitz conspired to conceal the identity of other officers who had participated in the fight and because the City failed to discipline Adams for his conduct. (*See* R. 141-1, Pl.'s Br. in Opp. to Mot. for Summ. J. re City of Chicago, p.7.) Lyons does not cite any authority for the proposition that ratification is sufficient to impose liability under the doctrine of *respondeat superior* or pursuant to Section 10/9-102. Regardless, Lyons has not supplied evidence that ratification could apply here. Lyons has not shown that Koplitz was empowered by the City of Chicago to authorize the assault on Lyons or to conceal the involvement of other officers. Nor has he pointed to any evidence that the City of Chicago declined to discipline Adams for his conduct. Accordingly, Lyons' "ratification" argument fails.

28